Dennis Wayne ENOS, Appellant,

v.

The STATE of Texas, State.

No. 2–92–100–CR.

Court of Appeals of Texas, Fort Worth.

Oct. 19, 1995.

---

58. Tex.Penal Code Ann. § 22.01(a) (Vernon 1994).

59. *Sears, Roebuck & Co. v. Castillo*, 693 S.W.2d 374, 375 (Tex.1985).

Alan K. Butcher, John C. Beatty, and Tom Hill, Hill, Beatty, Butcher & Gallagher, Fort Worth, for Appellant.

Tim Curry, Criminal District Attorney; Betty Marshall and Charles M. Mallin, Assistant Chiefs of Appellate Section; Helena F. Faulkner, Assistant District Attorney, Fort Worth, for the State.

Before LIVINGSTON, RICHARDS, DAUPHINOT, and JOE SPURLOCK, II, (Retired), (Sitting by Assignment), JJ.

## OPINION ON REHEARING

LIVINGSTON, Justice.

This court withdraws its opinions and judgment of June 22, 1995 and substitutes the following in its place. Simultaneously, this court has considered the appellant's motion for rehearing en banc and such motion for rehearing en banc is denied and hereby overruled. The only revision to the original opinions is the addition of Footnote One to the majority opinion which addresses the dissenting opinion's discussion of the majority's harm analysis.

Dennis Wayne Enos ("appellant") pled guilty to one count of aggravated robbery with a deadly weapon and true to an enhancement paragraph. A jury assessed punishment of seventy-five years' imprisonment. On appeal this court affirmed appellant's sentence. *Enos v. State,* 859 S.W.2d 594 (Tex. App.—Fort Worth 1993), *rev'd,* 889 S.W.2d 303 (Tex.Crim.App.1994). The Texas Court of Criminal Appeals reversed and remanded the case to this court under appellant's fourth and fifth points of error. Generally, points of error four and five address the trial court's refusal to allow appellant to examine the victim impact statement of the complainant after she testified. This court previously overruled both points of error, holding that a *Gaskin* analysis was not applicable in light of article 56.03(g), "Victim Impact Statements," of the Texas Code of Criminal Procedure. The Court of Criminal Appeals, however, concluded that article 56.03(g) "by its plain language, concerns only the discoverability of victim impact statements *before* a victim testifies, where as the *Gaskin* rule concerns the discoverability of statements *after* a witness testifies on direct examination." *Enos,* 889 S.W.2d at 305. Accordingly, we must determine whether the victim impact statement was discoverable under the *Gaskin* rule. *See Gaskin v. State,* 172 Tex.Crim. 7, 353 S.W.2d 467, 469 (1961). We affirm because while the victim impact statement was discoverable under *Gaskin,* the error was harmless beyond a reasonable doubt.

The *Gaskin* rule provides that once a witness has testified for the prosecution, the defendant is entitled to inspect any written statements made by the witness prior to testifying. *Id.* at 469. The purpose of this rule is to assist the defendant in cross-examining the witness. *Id.* The *Gaskin* rule, however, is only applicable to a witness' statements that relate to the subject matter of the witness' testimony. *Williams v. State,* 542 S.W.2d 131, 138 (Tex.Crim.App.1976).

Here, Shirley Mimms, the complainant, testified about the effects the hold-up at the bank had on her. The State argues that the witness' testimony related to the short-term effects of the robbery while the victim impact statement related to long-term effects. We do not find this hypertechnical argument persuasive, however. The purpose of the *Gaskin* rule is to better enable the defendant to cross-examine and possibly impeach a witness. *Enos,* 889 S.W.2d at 305. The testimony of the witness regarding the effects of the robbery was introduced during punishment to persuade the jury to give a harsher sentence based on the facts surrounding the crime. Given this motive, the long-term effects are related to the short-term effects that the witness testified about. Accordingly, we conclude it was error for the trial judge not to allow the appellant to review the victim impact statement following the complainant's testimony on direct examination.

Having found error, we must determine whether the error requires reversal. *Harris v. State,* 790 S.W.2d 568, 584 (Tex. Crim.App.1989). We must reverse the judgment under review unless we determine "beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment." Tex.R.App.P. 81(b)(2). Our harmless error analysis must focus upon the error rather than the propriety of the outcome of the trial, trace its probable impact upon the jury, and determine whether it contributed to the conviction or punishment. *Harris,* 790 S.W.2d at 585–87. Review concentrates on the fairness of the trial and the integrity of the process. *Id.* We consider the source and nature of the error, the extent that it was emphasized by the State, its probable collateral implications, the weight a juror would probably place on the error, and whether declaring it harmless would be likely to encourage the State to repeat it with impunity. *Id.* at 587. This requires an evaluation of the entire record in a neutral, impartial, and even-handed manner, not in the light most favorable to the prosecution. *Id.* at 586.

### The Source and Nature of the Error

The error in this case was the trial court's determination that the victim impact statement was not discoverable by appellant. As is apparent from the decision of the Texas Court of Criminal Appeals in this case, the interaction between victim impact state-

ments, article 56.03(g) of the Texas Code of Criminal Procedure, and the *Gaskin* rule had not been addressed previously. Based on this factual setting, we cannot conclude the State was responsible for the error in this case or was attempting to taint the outcome of the trial by refusing to produce the statement.

### Emphasis on the Error by the State

Looking at the trial and the State's use of the testimony during jury argument, we find the State did refer to the complainant's testimony during jury argument:

> And one thing I want to leave you with before I get away: There are victims in this case. One is Shirley Mimms, but by no stretch of the imagination do not disbelieve that the Enos family, Mr. and Mrs. Enos, are not victims of the life their son has chosen to lead.
>
> . . . .
>
> And ask yourself this: Does his plea of guilty in any way lessen the terror that Shirley Mimms experienced when she was looking down the barrel of a semi-automatic pistol that this Defendant was holding on her? That doesn't make any difference. Doesn't make any difference. The plea of guilty is not worth one ounce of mitigation.
>
> . . . .
>
> Now let's talk about punishment.
>
> In contrast, you can and should punish this Defendant very severely for what he's done. He's a four-time convicted felon; he's an armed robber; he's a man who held a woman's life at gunpoint and made her think that her next breath might be her last. When he left that bank, she collapsed in a heap on the floor, sobbing from hysterics.
>
> This is a man who deserves to be punished for life. Plain and simple.

Looking at the jury argument, we must conclude that the State reiterated Mimms' testimony regarding the offense, and such a focus emphasized the error of not allowing appellant an opportunity to review Mimms' statement before cross-examining her.

### Probable Collateral Implications of the Error

An analysis of collateral implications contemplates issues like the disparaging of a sole defense and the error's impact on sentencing. *Higginbotham v. State*, 807 S.W.2d 732, 737 (Tex.Crim.App.1991); *see also Norman v. State*, 862 S.W.2d 621, 624–25 (Tex. App.—Tyler 1993, pet. ref'd). Because appellant pled guilty, there was no "defense" presented in this case. Looking at the possible effects on sentencing, the available range of punishment for the offense of aggravated robbery with a deadly weapon was for a term of not less than fifteen or more than ninety-nine years' confinement, and the State argued for the maximum sentence. The jury, however, assessed punishment of seventy-five years' confinement. Having reviewed the record, we do not find any probable collateral implications of the error on sentencing.

### Probable Weight Placed on the Error by the Jury

While Mimms' testimony regarding the effects the robbery had on her was introduced at the punishment hearing, there were over two-hundred pages of testimony from other witnesses. The testimony informed the jury of the events surrounding the robbery and appellant's arrest. Further, Lori Sosebee ("Sosebee"), a manager at the bank where the robbery occurred, testified to the events surrounding the robbery, including that she was "frightened" and that appellant pointed a gun at Mimms. Sosebee also indicated that Mimms was "hysterical" after the robbery. Mimms' testimony covered the events immediately before, during, and after the robbery. Mimms also testified that she was hysterical immediately after the robbery.

In addition to the testimony surrounding the robbery, the State admitted evidence of appellant's criminal history. Appellant received three ten-year sentences for one attempted burglary and two burglaries in 1979. He was given "shock probation," and he served six months in jail before he was released on probation. His probation was revoked in 1981 for obtaining drugs by fraud, and he was sentenced to ten years' imprison-

ment. Appellant was released from prison in January 1989. He committed the aggravated robbery in this case on April 4, 1990.

Appellant introduced "mitigating" evidence at the punishment trial, focusing on his twenty-year struggle with drug addiction. Appellant's friends and family testified to appellant's addiction and unsuccessful treatment programs, and a psychologist testified to the physical and mental effects of heroin addiction.

While the failure to allow appellant to review Mimms' victim impact statement before cross-examining her was error, our review of Mimms' statement does not reveal any particularly fertile ground for cross-examination that was likely to have influenced the jury in sentencing appellant in light of the other evidence admitted at trial. Even if Mimms' credibility was brought into question through impeachment via the statement, the unchallenged testimony of Sosebee covered substantially the same areas as Mimms' testimony. Further, appellant's trial attorney conducted a cross-examination of Mimms that focused on the fact that appellant never actually tried to shoot anyone and appeared to be on drugs at the time of the robbery. Looking at the record as a whole, we do not believe the jury was likely to place significant weight on Mimms' testimony regarding the effects, long-term or short-term, that the robbery had on her.

### Repetition of the Error with Impunity

Finally, we must consider whether declaring the error harmless would be likely to encourage the State to repeat it with impunity. As we mentioned earlier, the State did not cause this error. Further, because the trial judge, in future cases, will know to apply the *Gaskin* analysis to requests for production of victim impact statements following a victim's testimony, this error in unlikely to be repeated in the future.

After reviewing the record in this case, we have determined beyond a reasonable doubt that the error made no contribution to appellant's conviction or punishment.[1] The judgment of the trial court is affirmed.

RICHARDS, J., dissents, joined by DAUPHINOT, J.

RICHARDS, Justice, dissenting.

I respectfully dissent. This case was remanded to permit us to consider whether defense counsel is entitled to review a witness's written "victim impact statement" pursuant to *Gaskin,* after the witness testifies. The majority correctly held that defense counsel was entitled to that information in this case.

My disagreement is with the majority's view that the non-disclosure of the statement in this case was harmless error.

Appellant entered a plea of guilty. The sole issue the jury was called upon to decide was the appropriate punishment. State's witness Shirley Mimms, the bank teller who was the victim of the aggravated robbery, testified at some length to the post-event trauma she experienced. Specifically, she testified that following the robbery she was hysterical, fell to her knees, and "just collapsed." She also stated she believed she had a right to go to a work place and not be subjected to such conduct. It is easy to imagine the terror the victim suffered following the robbery and it is not unreasonable for the jurors to have concluded from the testimony that Ms. Mimms may have suffered long-term trauma as a result of the incident. Certainly, her testimony was very likely considered by the jurors, who ultimately set punishment at seventy-five years' confinement.

Not known to defense counsel at trial or on appeal was that in the first paragraph of the

---

1. The *Harris* analysis used by this court *is* a Rule 81(b)(2) analysis, and this court's opinion discusses the more specific *"Harris* factors" that do not apply or would have little impact on the discussion. TEX.R.APP.P. 81(b)(2). The court of criminal appeals has never held, as proposed by the dissent, that the *Harris* analysis is or should be limited to cases of improper admission of evidence and it would be improper for this court to now do so. The result would be the same under a Rule 81(b)(2) analysis or a Rule 81(b)(2) analysis coupled with the *Harris* factors. *Id.* The remand was limited to whether the statement was admissible under the *Gaskin* rule, not to discern a more narrow application of the *Harris* factors.

victim impact statement completed two months following incident, Ms. Mimms indicated she had sought professional counseling as a result of the crime but, in retrospect, she regretted having sought counseling outside the approximate one hour she spent with a counselor at work. Her exact statement was, "Spoke with counselor at work for about an hour—regret seeking further help from private counselor of my choice."

Rule 81(b)(2) of the Texas Rules of Appellate Procedure requires that we reverse the case unless we determine, under the beyond a reasonable doubt standard, the error had no effect on the punishment assessed. Because it is reasonable to believe a skilled defense attorney could have used the quoted portion of the victim impact statement to counter the logical inference that the trauma the victim suffered was severe, I cannot conclude the error was harmless.

In its harm analysis the majority applies the formulaic test set forth in *Harris v. State,* 790 S.W.2d 568, 587 (Tex.Crim.App. 1989), *i.e.,* the source of the error, the nature of the error, whether or to what extent it was emphasized by the State, and probable collateral implications, the probable weight the jurors placed on the error, and whether declaring the error harmless would encourage the State to repeat it with impunity. I believe the Court of Criminal Appeals never intended the analysis employed in *Harris,* which concerned the improper introduction of extraneous offenses, to apply to all errors. Even the State admits in its brief, "because this case deals with nondisclosure of evidence, as opposed to improper admission of evidence, it is difficult to see how the State could have emphasized the error, how the error could have had collateral implications, or how the jury could have placed any weight on the alleged error." Clearly, it is time to admit many of the factors in what has become known as the *Harris* "test" have no relevance to harm analysis for some errors, including *Gaskin* violations. The critical holding of *Harris* is that the reviewing court should focus on whether the error at issue might possibly have prejudiced the jurors' decision making. Here, because it is reasonable to believe defense counsel could have

used the victim impact statement to his advantage, I cannot conclude the error was harmless.

DAUPHINOT, J., joins.